Filed 6/2/15  In re Jonathan M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JONATHAN M. et al., Persons Coming Under the Juvenile Court Law. | D067309 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518803ABC) |
| v. | |
| JULIETTE F., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Suzanne F. Evans, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

Juliette F. appeals orders continuing dependency jurisdiction under Welfare and Institutions Code section 364.[1] She contends the court erred when it continued jurisdiction because the initial protective issues had been resolved, there were no current protective issues concerning the children's care in her home, and she had complied with the fathers' visitation orders for two months. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Juliette F. is the mother of three sons, Jonathan M., Nathaniel M. and Noah Y. The children are now ages seven, six and two years old. Jonathan's and Nathaniel's father is J.M. Joshua Y. is Noah's father.

In October 2013, Joshua came to Juliette's house to visit then five-month-old Noah. He and Juliette had an argument about financial support for Noah. Juliette, who had been drinking, pushed Joshua and hit him in the face and head. Joshua called police. Juliette screamed obscenities at the police and had to be restrained. She was arrested for domestic violence and resisting arrest.

As a child, Juliette was emotionally and physically abused, and witnessed ongoing domestic violence in her home. She was involved in an incident of domestic violence with Jonathan and Nathaniel's paternal aunt in 2009. In 2013 she had a fist fight with a woman on a bus.

J.M. had custody of his sons for approximately a year and a half while Juliette was homeless. When she stabilized her circumstances, she regained custody. J.M. saw his

---

[1] Further statutory references are to the Welfare and Institutions Code.

2

sons every two weeks. When the children were detained in protective custody, J.M. told the social worker he was ready and able to care for his sons.

When Joshua was 19 years old, he was involved in a brawl in which someone was killed. Joshua served six and a half years in prison for manslaughter and was on probation. Joshua was respectful and cooperative with the social worker. He told her that he and Juliette had a brief relationship. During Juliette's pregnancy with Noah, he used methamphetamine and was jailed on a probation violation. He subsequently entered a drug rehabilitation program. Joshua was present at Noah's delivery. Joshua said every time he went to see Noah, Juliette started an argument with him.

The San Diego County Health and Human Services Agency (the Agency) placed Jonathan and Nathanial with J.M. Noah was placed with a paternal aunt. Joshua saw Noah every day and had unsupervised overnight visits with Noah. Noah bonded with his father. There were no reports of any protective issues for the children in their fathers' care.

Juliette participated in a domestic violence treatment group, individual counseling, a substance abuse treatment program and in-home parenting services. She made continual progress. The Agency recommended Juliette and Joshua attend a coparenting class. Juliette's therapist reported that she had a history of emotional dysregulation and impulsivity due to childhood trauma. The therapist recommended that Juliette receive psychiatric treatment and/or cognitive therapy to help manage her anxiety.

In April 2014, the Agency placed the children with Juliette on a 60-day trial visit. The social worker reported that visitation with the children's fathers became difficult to

3

arrange because of Juliette's heightened concerns. Juliette attempted to control every aspect of visitation. She was very upset about the Agency's plan to expand the father's visitation. The social worker said Juliette was having a very difficult time accepting that she would have to coparent her children with their fathers. Although Juliette was doing "a great job" caring for her children, she was not able to accept the fathers' presence in their children's lives.

In July, Juliette reported that Noah returned from a visit with Joshua with multiple superficial scratches. The Agency investigated and determined Noah had not been abused. Juliette became extremely upset when the Agency did not stop visitation. She said the Agency was expanding Joshua's visits too quickly and she was not comfortable with Joshua's wife.

The social worker made an unannounced visit during Joshua's next visit with Noah. He said Noah was very happy with his father. Joshua was working fulltime. He had stable housing, and lived with his wife, their infant and her two-year-old son. There were no safety concerns in their home. Juliette did not cooperate with J.M., who had visits every other weekend with his sons at his home in Riverside County. Juliette allowed J.M. to visit Jonathan and Nathaniel only under her supervision.

The court held a special hearing on two dates in July to address visitation. Juliette did not appear at the first hearing date, saying two of her children were sick and she needed to take them to the doctor. The court issued an interim order directing Juliette to comply and cooperate with visitation. The court ordered the Agency to conduct body checks of Noah before and after visits. At the second hearing date, Juliette discussed her

4

concerns about Noah's safety in Joshua's care. The court ordered the Agency to continue to closely monitor the case, directed each parent to photograph Noah before and after each visit, and maintained the existing visitation schedule.

J.M. was not able to contact Juliette to arrange visits with Jonathan and Nathaniel from August to mid-October. The social worker believed the children were at risk of emotional trauma.

During a visit in August, Joshua texted Juliette to ask about Noah's bad diaper rash. Juliette believed Joshua was trying to make her look bad and telephoned child protective services and the local police department to conduct a child welfare check on Noah. Juliette told police she could tell by Joshua's text message that he was using methamphetamine. Joshua said the late night police visit traumatized Noah.

In September, Noah sustained bruises on his cheek and scratches on his forehead when he fell off a bed while wrestling with his two-year-old step-brother. The social worker said Joshua and his wife needed to better supervise the two toddlers in their care. Noah did not sustain any injuries the following weekend while visiting his father.

Juliette did not produce Noah for visits with Joshua for five weeks. She refused to provide the children's updated medical, developmental or educational information to the social worker. Juliette told the social worker "my son WILL NOT be left alone with that woman Joshua is married to or anyone else I don't approve of." Juliette discontinued therapy, telling the social worker she was required to participate in therapy for only six months.

The social worker concluded that Noah was not being physically abused but was at risk of emotional abuse. Noah was at risk of losing his relationship with his father. The Agency recommended the parents participate in a coparenting course. J.M. reported that Juliette did not allow him to take Jonathan and Nathaniel to his home and had reduced the time and frequency of his visits.

In late October, the Agency set a special hearing to address visitation. Juliette did not appear, stating that Jonathan was sick and she was taking him to the doctor that morning. The court granted her request for a two day continuance. The court ordered Juliette to appear at the rescheduled hearing and bring verification of the child's doctor visit.

At the rescheduled hearing, Juliette's attorney said Juliette wished to appear telephonically. However, she did not answer her phone. The court said Juliette's nonappearance was a willful effort on her part to frustrate the processes of the court. The court continued the matter to that afternoon. If Juliette did not appear, the court would issue a warrant for her arrest. Juliette's attorney informed the court that Juliette was available by telephone. Juliette argued with the court when the court directed her to appear and bring Noah with her. The court said, "Let's put it this way, ma'm. Either you can come voluntarily or we will have the police come and pick you up and bring you down."

Juliette appeared in court that afternoon. When discussing problems with visitation, Juliette said, "I literally had to deny [Joshua's] visits because nobody was

6

listening to me." When asked whether she intended to comply with the visitation order that weekend, Juliette said, "I have no idea . . . because of my concerns."

The court told Juliette: "In our society we have to depend on courts to resolve conflicts. . . . And we have courts that have to make orders . . . to resolve things when people, for whatever reason, can't do it themselves. Those orders must be followed. If they are not followed, there are consequences. Those consequences can, in your particular situation, be significant [describing contempt proceedings and loss of custody]. . . . Your position in unilaterally deciding whether to have the visits or not is creating that kind of a situation. You are putting your position in jeopardy, whether you agree with the visitation orders or not."

The court specifically directed Juliette to make the child available to the father for any and all scheduled visitation. It directed Juliette and Joshua to attend and complete a cooperative parenting class as part of the parenting component of their case plans. The court also directed Joshua to complete the in-home parenting safe care model parenting course.

On a subsequent visit, Noah was hit in the head with a ball by a child at Chuck E. Cheese. Noah sustained a reddish mark on top of his right eyebrow. Joshua documented the incident, recorded an eyewitness's statement and took Noah to the hospital. Juliette was very upset when she learned of the incident. She told the social worker she was going to Chuck E. Cheese to speak to the manager and she was taking Noah to Children's Hospital.

7

At a hearing on November 12, the court again reminded Juliette if she did not comply with visitation orders, the court could direct the Agency to consider removing the children from her care or find her in contempt of court. The court said, "You are jeopardizing the future of the kids [and] their relationship with their fathers."

The court held a review hearing on January 7, 2015. The Agency asked the court to continue jurisdiction. The social worker said if jurisdiction were withdrawn, conditions would exist that would justify the initial assumption of jurisdiction. Juliette did not complete a coparenting course or address her anxiety. Joshua had yet to complete the in-home safe care model for closer supervision of toddlers. Minors' counsel was "extremely opposed" to terminating jurisdiction. The parents had not yet learned to coparent in a healthy, stable manner. Counsel was concerned because Juliette had not responded to her requests to visit the children.

At this point Juliette interrupted the proceedings, saying everything that was being said was "so ridiculous." She said she could not attend a coparenting class with Joshua because she was uncomfortable being in the same room with him.

The court continued the dependency proceedings and vested custody, care and control of the children with the Agency. The court placed the children with both parents. Juliette interrupted the court, saying, "Help. This is crazy."

The court found there were no incidents with respect to visitation in the last two months because the court and Agency had supervised visitation "under a microscope." The court said it had held many special hearings about visitation that ordinarily were not necessary in a dependency proceeding. The court found that the parents, particularly the

8

mother, were not able to manage cooperative parenting on their own. Each child was entitled to the benefit of two parents. Juliette continued to display a reactive nature, anxiety and anger. The court directed Juliette to complete individual therapy and a coparenting class, noting that therapy may be required before she was able to participate in a coparenting class.

Juliette was agitated. She was talking while the court was giving its ruling. The court asked her, "Do you need to leave the courtroom? You need to leave please."

Juliette said, "I need to hear this," and left the courtroom.

The court found that Joshua and J.M. were ready to engage in coparenting classes but could not complete the program by themselves. The court ordered Joshua to complete an in-home parenting course, and ordered that minors' counsel or investigator be allowed to meet with the children.

## DISCUSSION

Juliette claims the court erred in continuing the children's dependency proceedings. She argues there were no protective risks to the children and she had complied with visitation orders for two months. Her argument is without merit.

When dependent children are placed with a parent, the juvenile court is required to hold a review hearing every six months. (§ 364, subd. (a).) At the hearing, the court is required to determine whether continued supervision is necessary: "The court shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if

9

supervision is withdrawn. Failure of the parent or guardian to participate regularly in any court ordered treatment program shall constitute prima facie evidence that the conditions which justified initial assumption of jurisdiction still exist and that continued supervision is necessary." (§ 364, subd. (c).)

We review the decision to continue dependency jurisdiction under the substantial evidence test. (*In re N.S.* (2002) 97 Cal.App.4th 167, 172.)

Juliette's failure to participate in court-ordered therapy, recommended treatment and a coparenting class constitute prima facie evidence that the conditions which justified initial assumption of jurisdiction still exist and continued supervision is necessary. (§ 364, subd. (c).) Juliette did not rebut this presumption at the hearing. In fact, her lack of respect for court processes permits the reasonable inference she was complying with the visitation orders only because the court repeatedly warned her that failure to do so could result in the loss of custody of her children and/or contempt proceedings.

We reject the argument that because Juliette had complied with visitation during the two months before the hearing, there was no longer any protective risk to the children. In impeding the children's visits with their fathers, Juliette subjected her children to emotional abuse. The record shows it was necessary for the court and the Agency to expend scarce resources to ensure her compliance with standard visitation orders. Juliette's outbursts in the courtroom at the review hearing permit the reasonable inference she was unwilling to share custody with the children's fathers.

The court found that Juliette continued to display a reactive nature, anxiety and anger. This finding is supported by the record. Jonathan's and Nathaniel's father cared

10

for them for a year and a half while Juliette was homeless, with no reports of inadequate care. J.M. did not want to fight with Juliette and took a low-key approach to asserting his visitation rights. Jonathan and Nathaniel were comfortable and happy in their father's care. Juliette willfully and unreasonably interfered with J.M.'s visitation rights, to her children's detriment. Joshua was more assertive of his visitation rights. Juliette was more confrontational with him. This dynamic led to the incident of domestic violence that necessitated the children's dependency proceedings. By not complying with the visitation order, Juliette placed Noah's relationship with his father at risk. The social worker observed that when Noah was with his father, Noah was "happy, smiling and laughing." During one visitation exchange, Noah was immediately comforted when Joshua arrived.

Contrary to Juliette's argument, this case is not similar to *In re N.S.*, *supra*, 97 Cal.App.4th 167, in which this court held that the juvenile court erred in continuing jurisdiction. In that case, the evidence showed that the parent was in total compliance with his case plan. He was cooperative with the social worker and complied with all court orders. (*Id*. at p. 173.) Here, the record contains ample evidence to show that Juliette was not in total compliance with her case plan, did not cooperate with the social worker and did not willingly comply with court orders.

To avoid a recurrence of the events that brought the children within its jurisdiction and to preserve the children's relationships with their fathers, the court reasonably determined that continued jurisdiction was necessary. (§ 364.) In view of Juliette's disregard of the children's emotional well-being and long-term stability, and the resources

11

necessary to ensure Juliette's compliance with visitation orders, the court exercised great patience in allowing the children to remain in her care.

The orders are affirmed.

                                                                 
O'ROURKE, J.

WE CONCUR:

                       
BENKE, Acting P. J.

                       
IRION, J.